# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| **ETHICON ENDO-SURGERY, INC.,** | Case Action No. 1:07cv1016 |
| **Plaintiff,** | Judge Michael R. Barrett |
| v. | |
| **CRESCENDO TECHNOLOGIES, LLC, et al.,** | |
| **Defendants.** | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court after a jury trial and verdict (See Doc. 105). Now before the Court is its findings of fact and conclusions of law on the issue of equitable relief to Plaintiff Ethicon Endo-Surgery, Inc. ("EES") and a determination as to pre-judgment and post-judgment interest.

**I.  FINDINGS OF FACT**

    **A.  The Evidence Supports Awarding Equitable Relief to EES.**

        **1.  The Jury Found a Breach of Mr. Beaupré's Invention Assignment Agreement with EES for Three Patent Applications, and Its Verdict Was Supported by Substantial Evidence.**

1. The case between EES and Defendants Crescendo Technologies, LLC, ("Crescendo") and Jean M. Beaupré (collectively, "Defendants") proceeded to trial beginning June 3, 2009, and the jury reached a verdict on June 12, 2009.

2. Among other findings, the jury found that Defendant Jean M. Beaupré breached a contract with EES by assigning to Crescendo certain discoveries,

improvements or ideas that he had during the time of his employment at EES that related to or resulted from his EES work.  (*See* Jury Verdict, Docket No. 105, at 5.)

3. Specifically, the jury found that Mr. Beaupré breached a contract with EES by assigning to Crescendo the following patent applications:  (1) U.S. Patent Application Publication Number 2006/0100652 ("the '652 application"); (2) U.S. Patent Application Publication Number 2007/0016236 ("the '236 application"); (3) Mr. Beaupré's April 18, 2008 provisional application entitled "Balanced Ultrasonic Curved Blade" ("the April 18 Curved Blade Provisional").  (*See id.* at 5.)

4. Mr. Beaupré's agreement with EES to assign inventions to EES is found at paragraph 1 of his June 26, 1995 Employee Secrecy Agreement ("ESA").  (*See* Joint Exhibit 3; Uncontroverted Fact No. 2, Joint Final Pretrial Order, Docket No. 53 at 4.)  In the ESA, "INVENTIONS" are defined as "discoveries, improvements, and ideas, whether patentable or not."  (*See* Joint Exhibit 3.)

5. There was substantial evidence to support the jury's finding that this provision was breached.  (*See, e.g.*, Trial Transcript at 2-167:20 to 2-168:24 (testimony from Jeffrey Christian, who was admitted at trial as an expert on medical devices, technical issues related to medical devices, patents, and patent applications, without objection); at 2-179:11 to 2-192:10 (same, regarding the '652 Application); at 2-194:19 to 2-201:4 (same, regarding the '236 Application); at 3-15:25 to 3-19:9 (same, regarding the April 18 Curved Blade Provisional); at 7-102:6 to 7-113:25 (testimony regarding the '652 Application from Dr. Mark Schafer, who was admitted at trial as an expert in ultrasonics, ultrasonic medical devices, and patents, without objection); at 7-119:11 to

2

7-125:18 (testimony from Dr. Schafer regarding the '236 Application); and at 7-126:4 to 7-131:19 (testimony from Dr. Schafer regarding the April 18 Curved Blade Provisional).

> **2. The Evidence Demonstrates That If Crescendo Retains the Misappropriated Patent Applications and Issued Patent, EES Will be Irreparably Harmed.**

6. At trial, EES's Worldwide Vice President of Research and Development, John Carlson, testified that it would be "incredibly detrimental" to EES if employees like Defendant Jean M. Beaupré were permitted to take inventions they worked on at EES and try to patent them in the name of a different company. (*See* Trial Transcript at 1-76:12-23.)

7. Mr. Carlson explained that if employees could take such actions, they "could take our internal knowledge, go out and patent it, and prevent us, the people who paid for the design and development of those products, from actually getting the benefits associated with those." (*See id.*)

8. As Mr. Carlson further added, if employees generally took such actions, "all research and development would stop. There would be no benefit for a company to have a development organization. You would stop investing in that. You would let the employees go. And you would stop to get the benefits; you'd stop to get the innovations that the marketplace is looking for." (*See, e.g., id.* at 1-76:24 to 1-77:8.)

9. Mr. Carlson also stressed that EES's employment agreements with its engineers guard against exploitation of EES technologies by competitors. (*See id.* at 1-65:8-16; 1-74:8 to 1-75:10.)

10. EES engineer Kevin Houser testified that EES's research and development work, including disclosures of inventions by its engineers, is very sensitive,

3

because "we spend a lot of our time and a lot of the company's resources in terms of both monetary and business resources…in the development of products…That's a lot of investment that gets made."  (*See id.* at 1-102:16 to 1-103:23.)  Mr. Houser further stressed that keeping these confidential ideas out of the hands of competitors is vitally important:  "Competitors would love to have that kind of information."  (*See id.* at 1-103:17-23.)

11. Mr. Houser noted that EES would not even sell physical materials to a competitor: "We wouldn't sell materials to a competitor at all…[W]e would not make a habit or a practice of selling anything to a competitor, because, again, that knowledge, knowing what it is and how we produce particular products, is very important to competitors.  They can look at that type of work, find out exactly what we're doing, and short-cut their own development processes again."  (*See id.* at 2-36:19 to 2-37:6.)

12. Mr. Carlson's and Mr. Houser's testimony was not rebutted by any contrary evidence.

13. Mr. Beaupré testified on cross examination that Crescendo is a competitor of EES and that its devices are competing devices.  (*See id.* at 4-163:14-24; 5-79:7-14.)

14. Mr. Beaupré further testified that Crescendo has the technology to compete with EES, and can use patent protection to block others from using Crescendo's technology.  (*See id.* at 4-183:22 to 4-184:3.)  Mr. Beaupré admitted that if Crescendo retains its patent applications and they issue into patents, Crescendo could block EES itself from utilizing the inventions claimed.  (*See id.* at 5-8:3-12.)

15. The jury found that three Crescendo patent applications are for discoveries, improvements, or ideas that Mr. Beaupré was under an obligation to assign

to EES. (*See* Jury Verdict, Docket No. 105, at 5.) Those applications are the '652 Application, the '236 Application, and the April 18 Curved Blade Provisional. (*See id.*) The '652 Application has issued as U.S. Patent No. 7,479,148 B2. (*See* Joint Exhibit 50.)

16. The Court finds that irreparable harm to EES would result if Defendants were permitted to keep the three misappropriated patent applications, related applications (including foreign counterparts), or issued patents therefrom. A situation would be created in which Defendants, who compete with EES, not only would be able to use the ideas that properly belong to EES to further their competition, but also would potentially be able to exclude all others, including EES, from practicing the inventions claimed. This would result in lasting and unjust competitive harm to EES.

17. Moreover, Defendants have published to the world, including all of EES's other competitors, ideas that the jury found properly belonged to EES. That further compounds the irreparable harm.

        **3.**    **The Evidence Demonstrates That If Crescendo Retains the Misappropriated Patent Applications and Issued Patent, There is No Adequate Remedy at Law for the Harm That Would Be Caused to EES.**

18. Kevin Arst was admitted at trial as an expert on damages with no objection. (*See* Trial Transcript at 3-61:22 to 3-62:1.) In preparing his analysis, he conducted background research, reviewed business records from both EES and Crescendo, read deposition transcripts from witnesses, conducted interviews with EES personnel from the accounting, marketing, and engineering departments, and investigated publicly available research reports and SEC filings. (*See id.* at 3-62:14 to 3-63:10.)

5

19. While Mr. Arst testified about a reasonable royalty rate to compensate EES in this case for the misappropriation of its intellectual property, he stressed that the analysis was a "hypothetical negotiation" and that he did not think that EES would have willingly licensed its intellectual property to Crescendo. (*See id.* at 3-66:2 to 3-67:11.) Mr. Arst noted that "a company like EES would have had very little economic incentive to license its technology to a company like Crescendo that intended to compete with EES." (*See id.* at 3-67:5-8.)

20. Mr. Arst also testified that it was significant to his analysis that Crescendo intended to compete with EES and free ride on EES's marketing efforts, because "in a licensing context, you wouldn't want to license away technology to a competitor who anticipated using that technology to compete with you in the market, and that would be especially true for a competitor that was just planning to introduce a generic product to compete with you." (*See id.* at 3-74:9 to 3-75:2.)

21. Mr. Arst further testified that in the hypothetical negotiation in this case, "EES is always going to lose more money than Crescendo's going to gain" because Crescendo was anticipating undercutting EES's price and Crescendo had a higher risk profile than EES for marketing ultrasonic products. (*See id.* at 3-91:14 to 3-92:3.)

22. Mr. Arst stated that he "would have never expected this [hypothetical] license agreement to be reached in the real world…because of the difference" in the values of the technologies to EES and to Crescendo. (*See id.* at 3-92:4-6.) Mr. Arst explained that "[i]n a licensing situation, a company like EES would…want to improve their value by entering transactions, not reduce their value." (*See id.* at 3-92:6-9.)

23. Mr. Arst's testimony was not rebutted by any contrary expert opinion or evidence.

24. The Court finds that EES would not have willingly licensed its intellectual property to Crescendo or Mr. Beaupré, even for the calculated hypothetical royalty, which calculation assumed a willing licensor and licensee. Money damages cannot be adequate to compensate EES for a forced transfer it never would have made to a start-up competitor that planned to undercut EES in price and free-ride on EES's marketing efforts.

25. If Defendants are permitted to keep the misappropriated patent applications and any resulting patents, the harm to EES from Defendants' actions includes essentially a forced transfer of intellectual property to EES's direct competitor and publication of that intellectual property to the world through patent applications. Such harm is ongoing, involves a multitude of potential market participants besides EES and Defendants, and is impossible to quantify precisely. As such, the Court finds that if injunctive relief is not granted, EES has no other adequate remedy at law.

26. Further, both Mr. Beaupré and Crescendo are of questionable solvency in the face of damages exceeding $1,000,000 against each, creating a substantial risk that the full measure of damages owed to EES will not be obtainable from them.

### 4. The Evidence Does Not Show That the Public or Third Parties Would Be Harmed by Reassignment of the Patents.

27. There is no evidence of any public or third party injury that would be caused by EES's requested equitable relief. On the contrary, Mr. Carlson's testimony supports a finding that in the absence of equitable relief, both the public and EES's employees would potentially be harmed by an unjust counterfeiting of EES's substantial

investments in developing new and improved medical technologies. (*See, e.g.*, Trial Transcript at 1-76:12 to 1-77:8.) Mr. Carlson's testimony indicates that EES's investments in the development of medical technologies, which are motivated by EES's retention of the benefits of those investments, help to employ many engineers and others, and also help to provide new medical technologies to the public that improve patient outcomes. (*See id.* at 1-57:24 to 1-58:19; *see also id.* at 1-74:4 to 1-75:10).

### B. Factual Findings Supporting Prejudgment Interest

28. The jury found damages of $12,500 against Mr. Beaupré for breaching a contract by failing to return EES property. (*See* Jury Verdict, Docket No. 105, at 2.) The date at which that amount was owed to EES as a matter of equity was October 31, 2003, the date on which he was obligated to return said property. (*See* Joint Exhibit 3 ¶ 1; Joint Exhibit 4 ¶ 2.) Mr. Beaupré, in essence, improperly enjoyed the benefits of retaining $12,500 from that date to the date of entry of judgment in this case.

29. The jury found damages of $50,000 against Mr. Beaupré for breaching a contract by disclosing, using or publishing confidential EES information. (*See* Jury Verdict, Docket No. 105, at 3.) The date at which that amount was owed to EES as a matter of equity was January 1, 2004, which is at or later than the time that Mr. Beaupré began using EES's confidential information. (*See, inter alia*, Joint Exhibit 10; Uncontroverted Facts No. 3-4 & 12-13, Joint Final Pretrial Order, Docket No. 53 at 4-6.) Mr. Beaupré, in essence, improperly enjoyed the benefits of retaining $50,000 from that date to the date of entry of judgment in this case.

30. The jury found damages of $42,000 against Mr. Beaupré for breaching one or more contractual commitments not to compete with EES. (*See* Jury Verdict,

Docket No. 105, at 4.) The date at which that amount was owed to EES as a matter of equity was January 1, 2004, which is at or later than the time that Mr. Beaupré began his work for Crescendo, a competitor of EES. (*See, inter alia*, Joint Exhibit 10; Uncontroverted Facts No. 12-13, Joint Final Pretrial Order, Docket No. 53 at 6.) Mr. Beaupré, in essence, improperly enjoyed the benefits of retaining $42,000 from that date to the date of entry of judgment in this case.

31. The jury found damages of $300,000 against Mr. Beaupré for breaching a contract by assigning to Crescendo the '652 Application. (*See* Jury Verdict, Docket No. 105, at 5.) The date at which that amount was owed to EES as a matter of equity was November 8, 2004, which is the filing date of the provisional patent application to which the '652 Application claims priority. (*See* Joint Exhibit 24.) Mr. Beaupré, in essence, improperly enjoyed the benefits of retaining $300,000 from that date to the date of entry of judgment in this case.

32. The jury found damages of $400,000 against Mr. Beaupré for breaching a contract by assigning to Crescendo the '236 Application. (*See* Jury Verdict, Docket No. 105, at 5-6.) The date at which that amount was owed to EES as a matter of equity was July 18, 2005, which is the filing date of the provisional patent application to which the '236 Application claims priority. (*See* Joint Exhibit 31.) Mr. Beaupré, in essence, improperly enjoyed the benefits of retaining $400,000 from that date to the entry of judgment in this case.

33. The jury found damages of $300,000 against Mr. Beaupré for breaching a contract by assigning to Crescendo the April 18 Curved Blade Provisional. (*See* Jury Verdict, Docket No. 105, at 5-6.) The date at which that amount was owed to EES as a

matter of equity was April 18, 2008, which is the filing date of the provisional patent application to which the '652 Application claims priority. (*See* Joint Exhibit 42.) Mr. Beaupré, in essence, improperly enjoyed the benefits of retaining $300,000 from that date to the date of entry of judgment in this case.

## II. CONCLUSIONS OF LAW

### A. Reassignment to EES of the Three Misappropriated Patent Applications and Related Applications and Issued Patents is An Appropriate Remedy.

#### 1. Without Injunctive Relief, EES Will Suffer Irreparable Harm For Which There Is No Other Adequate Remedy at Law.

34. EES is entitled to injunctive relief if "failure to issue the injunction is likely to result in irreparable harm" and "there is no other adequate remedy at law." *See United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002) (citations omitted).

35. Irreparable harm generally results from misappropriation of intellectual property by a competitor because of the potential for lasting and unjust competitive harm that would otherwise not occur. *See Acumed, LLC v. Stryker Corp.*, 551 F.3d 1323, 1328-29 (Fed. Cir. 2008) (granting permanent injunction to avoid irreparable harm of adding a new competitor to the marketplace); *Bio-Tech. Gen. Co. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (upholding preliminary injunction to protect patentee's revenues, goodwill, and ability to conduct research).

36. Moreover, in this case, EES and Crescendo currently compete in the area of pursuing patent protection for ultrasonic inventions. EES would suffer irreparable harm if Crescendo retains control over the misappropriated patent applications, because EES would no longer be free to pursue patents or maintain protection for its ideas as it sees fit, free of interference or complication from Crescendo's public disclosure and claiming of EES's own ideas. This harm cannot be undone absent

reassignment of the patent applications to EES, and even injunctive relief can only partially undo the harm to EES from Defendants' public disclosures and patent prosecution concerning EES's ideas that were undertaken without EES's consent.

37. There is no other adequate remedy at law when a competitor misappropriates intellectual property to unfairly compete. Money damages are inherently inadequate because they do not restore the wronged party to the position of being the exclusive user of the intellectual property. *See Muniauction, Inc. v. Thomson Co.*, 502 F. Supp. 2d 477, 482 (W.D. Pa. 2007) ("If plaintiff cannot prevent its only competitor's continued infringement of its patent, the patent is of little value."), *rev'd on other grounds*, 532 F.3d 1318 (Fed. Cir. 2008); *Smith & Nephew, Inc. v. Synthes*, 466 F. Supp. 2d 978, 984 (W.D. Tenn. 2006) ("Relief in the form of monetary damages alone would not meet the ends of justice here because this remedy would allow the infringement to continue.").

38. In addition, the full measure of appropriate money damages is often impossible to calculate when the wrongful acts are undertaken by a competitor, creating unfair competition. *See, e.g., Certified Restoration Dry Cleaning v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (reversing the district court's denial of a preliminary injunction in part because "the loss of fair competition that results" from the breach of a contract by a former employee in order to compete with a former employer "is likely to irreparably harm an employer" with damages that are "difficult to calculate") (quotation omitted); *Muniauction*, 502 F. Supp. 2d at 483-84 (noting that at least some damage from a competitor such as harm to reputation and threat to market share is "incapable of

measurement in monetary terms"), *rev'd on other grounds*, 532 F.3d 1318 (Fed. Cir. 2008).

39. Moreover, money damages from Crescendo and Mr. Beaupré are inherently insufficient to compensate EES for the damage that has been done by publishing EES's ideas through patent applications -- so that all of EES's competitors have access to those ideas -- without EES having any control over the decision to seek patent protection, the scope of that protection, or the manner of prosecution of the patent applications.

40. In addition, a risk that a wronged party will not be able to obtain the full measure of damages due to a defendant's insolvency supports a finding that there is no other adequate remedy at law in the absence of injunctive relief. *See Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) (stating that a preliminary injunction is appropriate "when it is shown that the defendant is likely to be insolvent at the time of judgment") (quotation omitted); *Interpoint Corp. v. Truck World, Inc.*, 656 F. Supp. 114, 118 (N.D. Ind. 1986) (finding one joint defendant's solvency "questionable" and holding that "[a] defendant's potential insolvency…satisfies the requirement of an inadequate remedy at law.") (citation omitted). The risk that Mr. Beaupré, Crescendo, or both will not be able to provide to EES the full money damages owed further supports the Court's finding that EES has no other adequate remedy at law in the absence of injunctive relief.

### 2. Injunctive Relief to Enforce a Contractual Promise to Assign Intellectual Property is Appropriate and in the Public Interest.

41. "Enforcement of contractual duties is in the public interest." *Certified Restoration Dry Cleaning v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) (reversing the district court's denial of a preliminary injunction).

42. Where intellectual property has been found to be misappropriated through a patent application, it is appropriate equitable relief to reassign the application. *See, e.g., Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1249-50 (Fed. Cir. 1989) ("The courts are not powerless to redress wrongful appropriation of intellectual property."); *Cargill, Inc. v. Sears Petroleum & Transp. Co.*, No. 5:03-cv-0530, 2004 WL 3507329, at *14 (N.D.N.Y. Aug. 27, 2004) ("[T]he remedy of specific performance [of assignment] is not only appropriate, but required in order to provide [wronged party] a full measure of relief."); *Union Carbide Corp. v. Tarancon Corp.*, 742 F. Supp. 1565, 1581 (N.D. Ga. 1990) (ordering transfer to plaintiff of defendant's patent that was found to misappropriate the plaintiff's trade secret).

43. To remedy the full scope of the harm, it is also appropriate to reassign all related patent applications and issued patents (including foreign counterparts), so that the wrongdoer is not improperly rewarded for its misappropriation. *See, e.g., Monovis, Inc. v. Aquino*, 905 F. Supp 1205, 1236 (W.D.N.Y. 1994) (ordering reassignment of all worldwide patents and patent applications embodying the technology at issue); *De Long Co. v. Lucas*, 176 F. Supp. 104, 134 (S.D.N.Y. 1959) (ordering assignment of two misappropriated patent applications, "any patents which may have been granted thereon, and all foreign patent applications and patents which are based thereon"); *Andreaggi v. Relis*, 408 A.2d 455, 472-73 (N.J. Super. Ct. Ch. Div. 1979) (applying New Jersey law and ordering assignment of patents under employment contract, including

"the divisional patents and the foreign patents based upon the United States patent application").

44. Equitable reassignment is appropriate for intellectual property that is misappropriated in a patent application even where there is not an explicit contractual provision calling for assignment of inventions that the jury has found to be breached. *See, e.g., Richardson*, 868 F.2d at 1249-50 (directing applicant to assign patent where jury had found that applicant learned of the invention from plaintiff); *Standard Parts Co. v. Peck*, 264 U.S. 52, 56-57, 60 (1924) (ordering assignment of invention arising out of employment without an explicit contractual agreement).

45. The propriety of equitable relief is even more apparent in a case such as this, where the jury has found a breach of an explicit invention assignment clause. Specific enforcement of the contractual obligation to assign the patent application is proper. *See, e.g., Cargill*, 2004 WL 3507329, at *13-14 (granting specific performance of agreement to assign any patents based on certain confidential information); *Andreaggi*, 408 A.2d at 472-73 (applying New Jersey law and ordering assignment of patents under employment contract).

### 3. Conclusion Regarding Reassignment of Patent Applications that the Jury Found Were Wrongfully Assigned to Crescendo and Other Applicable Relief

46. EES is entitled to injunctive relief as a remedy for Mr. Beaupré's breach of his contractual obligation to assign inventions to EES. The following applications should be and shall be re-assigned to EES: the '652 Application, the '236 Application, the April 18 Curved Blade Provisional, any patents issuing therefrom, as well as any patent application(s) or patent(s) that claim(s) priority to any of these applications or patents, including without limitation related patent applications, continuations, continuations-in-

14

part, divisionals, any foreign counterparts, issued patents, reissues, re-examinations, renewals or extensions thereof. Defendants shall, at their own expense and without any cost to EES, perform all acts and execute all documents that are needed to effect the assignments and to register the assignments with the applicable patent authorities. The findings and provisions of this paragraph include, but are in no way limited to, U.S. Patent No. 7,479,148 B2, a patent that has issued from the '652 Application.

47. The equitable relief in the paragraph above is in addition to the money damages awarded by the jury and the declaratory relief to which EES is entitled, namely that EES is the proper owner of the inventions of the '652 Application, the '236 Application, and the April 18 Curved Blade Provisional.

### B. EES is Entitled to Pre- and Post-Judgment Interest
#### 1. Prejudgment Interest

48. When a federal court decides state law claims, prejudgment interest is awarded according to state law. *See Mills v. River Terminal Ry. Co.*, 276 F.3d 222, 228 (6th Cir. 2002).

49. Under New Jersey law, "in contract actions, prejudgment interest is assessed on a discretionary basis as the result of the application of equitable principles." *See DialAmerica Marketing, Inc. v. KeySpan Energy Corp.*, 865 A.2d 728, 732 (N.J. Super. 2005). "The basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled." *County of Essex v. First Union Nat. Bank*, 891 A.2d 600, 608 (N.J. 2006) (quotation omitted).

50. New Jersey Court Rule 4:42-11 provides an appropriate benchmark for establishing the rate of prejudgment interest. *See DialAmerica*, 865 A.2d at 733. It is within the trial court's discretion to determine the date on which the prejudgment interest starts to accrue. *See Devine v. Advanced Computer Concepts, Inc.*, Civ. No. 08-875 (GEB), 2009 WL 78158, at *3 (D.N.J. Jan. 9, 2009) (citation omitted).

51. The Court adopts the interest rates and resulting interest amounts reflected in the attached calculations of Kevin M. Arst, who was admitted at trial as an expert on damages with no objection. Mr. Arst's calculations demonstrate that the appropriate amount of prejudgment interest for contract damages in this case is $148,325, based on the interest rates of New Jersey Court Rule 4:42-11 and the proper starting dates for the accrual of interest noted above.

52. Jean M. Beaupré shall pay EES $148,325 in prejudgment interest on the contract damages found by the jury.

### 2. Post-Judgment Interest

53. "Under 28 U.S.C. § 1961, district courts are required to award post judgment interest." *Florists' Mut. Ins. Co. v. Ludy Greenhouse Mfg. Corp.*, 521 F. Supp. 2d 661, 692 (S.D. Ohio 2007). "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding," and "shall be computed daily to the date of payment." *See* 28 U.S.C. § 1961(a), (b). Post-judgment interest should be calculated and paid for all damages, including prejudgment interest amounts, and for any later awarded costs. *See Florists'*, 521 F. Supp. 2d at 692.

54. Defendants shall pay EES post-judgment interest in accordance with the provisions of 28 U.S.C. §1961 set out above.

**IT IS SO ORDERED.**

*s/Michael R. Barrett*
United States District Judge